UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

United States of America *ex rel.*
Mary Patzer,

        Plaintiff,

     v.

                           Civil Action, File No. 11-C-560

SIKORSKY AIRCRAFT CORPORATION,
SIKORSKY SUPPORT SERVICES, INC., and
DERCO AEROSPACE, INC.

        Defendants.

**FIRST AMENDED COMPLAINT IN INTERVENTION OF
THE UNITED STATES OF AMERICA**

     Pursuant to 31 U.S.C. § 3731(c), and Fed. R. Civ. P. 15(a)(1)(B), plaintiff United States of America alleges as its Amended Complaint:

**A.      INTRODUCTION**

    1.     This is an action by the United States of America under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and under the common law theories of breach of contract and unjust enrichment.  The defendants are Sikorsky Aircraft Corporation (SAC) and two of its subsidiaries, Sikorsky Support Services, Inc. (SSSI), and Derco Aerospace, Inc. (Derco).

    2.     As set forth in greater detail below, this case involves a deliberate scheme to defraud the United States through the use of an illegal cost-plus-a-percentage-of-cost subcontract that was used to fulfill, in part, a Navy prime contract.  The cost-plus-a-percentage-of-cost form of contracting or subcontracting in matters where the United States is the final customer is expressly prohibited by applicable federal law, *see* 10 U.S.C. § 2306(a); 41 U.S.C. § 3905(a) (2011) (formerly 41 U.S.C § 254(b)); and the Federal Acquisition Regulations (FAR), *see* 48 CFR.

52.244-2(h); and such contracts or sub-contracts are void *ab initio* because they violate public policy. *See Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1150 (Fed.Cir. 1983).

### B. JURISDICTION AND VENUE

3.    Because the United States is the plaintiff in this action, jurisdiction over this action is conferred by 28 U.S.C. §1345.

4.    Because at least one defendant resides and transacts business in this district, venue over this action is conferred by 31 U.S.C. §3732(a).

### C. PARTIES

5.    The Plaintiff is the United States of America (United States or Government).

6.    The Plaintiff-Relator is Mary J. Patzer (Patzer), a citizen and resident of Sun Prairie, Wisconsin.   On or about June 10, 2011, Patzer filed a complaint on behalf of the United States under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.*(FCA).

7.    Defendant Sikorsky Aircraft Corporation (SAC) is a Delaware corporation with a principle corporate office in Stratford, Connecticut.   *Inter alia,* SAC holds itself out as a "world leader in the design, manufacture, and service of military and commercial helicopters, fixed-wing aircraft, spare parts and maintenance, repair and overhaul services for helicopters and fixed-wing aircraft…."

8.    Prior to 2006 and until on or about February 24, 2008, SAC did business as and used the fictitious business names "Worldwide Customer Service" and "WCS."   On or about February 24, 2008 SAC discontinued the use of the Worldwide Customer Service and WCS names and began doing business as and using the fictitious business names "Sikorsky Aerospace Services" and "SAS."

9.      Defendant Sikorsky Support Services, Inc. (SSSI) is a Delaware corporation with a principle corporate office located in Stratford, Connecticut.   SSSI is a wholly-owned subsidiary of SAC.  *Inter alia*, SSSI holds itself out as "the service subsidiary of Sikorsky Aircraft Corp…. providing cost efficient aviation maintenance, logistics, and technical services…."

10.      Defendant Derco Aerospace, Inc. (Derco) is a Wisconsin corporation with a principle business corporate office in Milwaukee, Wisconsin.   Derco is a wholly-owned subsidiary of SAC.  *Inter alia*, Derco holds itself out as a "world leader in providing aircraft spares distribution, logistics solutions, repair services, and technical solutions to military and commercial customers around the globe."

### D.      THE FALSE CLAIMS ACT

11.      The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for certain specified acts.   The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.   With certain exceptions, the FERA amendments apply only to conduct occurring on or after May 20, 2009[1]   As the conduct as issue in this case occurred both before and after May 20, 2009, this complaint expressly incorporates both the pre-FERA and post-FERA provisions of the FCA, as applicable.

12.      The pre-FERA FCA provides, in pertinent part, that:

> (a) Any person who
>       (1) knowingly presents, or causes to be presented, to an
>       officer or employee of the United States Government or a

---

[1] Section 4(f) of FERA provides.   "The amendments made by this section shall take effect on the date of enactment of the Act [May 20, 2009] and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1), as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729 *et seq.*) that are pending on or after that date . . . ."

member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

\*\*\* or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . .

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729 (1986).

13.    The post-FERA FCA provides, in pertinent part, that:

(a)   LIABILITY FOR CERTAIN ACTS.—
       (1) IN GENERAL \* \* \* [A]ny person who –
       (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
       (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
       \* \* \* or
       (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) For purposes of this section, (1) the terms "knowing" and "knowingly" mean – (A) that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud . . . .

31 U.S.C. § 3729.

14.    The standard of proof under both the pre-FERA and post-FERA versions of the FCA is preponderance of the evidence.   31 U.S.C. § 3731(c) (1986); 31 U.S.C. § 3731(d) (2009).

### E.    THE NAVY SOLICITATION

15.    On November 9, 2005, the United States Navy's Naval Airsystems Command (Navy) issued Solicitation No. 00019-05-R-0046 (the Solicitation) requesting proposals for an indefinite delivery, indefinite quantity requirements contract related to the maintenance of Navy T-34, T-44 and T-6 aircraft.

16.    The Solicitation was for a Basic Performance Period to be followed by four Navy Options and included a mixture of Firm Fixed Price, Labor Hour and Cost Reimbursable services and supplies, each of which was denoted with a Contract Line Item Number (CLIN) and, in some instances, further denoted with a Sub-CLIN (SLIN).

17.    The Solicitation, at Section B-2, specified that CLINs X023 ("T-34 Parts and Material") and CLINs X045 ("T-44 Parts and Material") were "Cost Reimbursable."

18.    In pertinent part, the Solicitation, at Section B-5, "Pricing Notes" stated in subparagraph f as follows:

f.   T-35/T-44 Parts/Material * * *, CLIN's [sic] X023 [and] X045. The CLINs are COST REIMBURSABLE.   * * * The Government will reimburse the Contractor for the allowable actual cost of purchase and replenishment of direct parts and material, vendor repair services, and attendant shipping costs that are necessary for the performance of the work requirements of this contract, up to the funding ceiling * * * *   The Contractor shall acquire materials at the most advantageous prices available with due regard to securing prompt delivery of satisfactory materials * * * *   For parts and material or services procured from a vendor, the actual cost shall be the actual catalog/market price from the vendor.   Fee/profit is UNALLOWABLE on the actual price of parts, material and shipping costs.   The Contractor shall be allowed its actual shipping costs.   * * *[T]he Contractor shall be allowed its normal material burdens in accordance with FAR 52.216-7, "Allowable Cost and Payment," and actual shipping costs.   Offerors shall complete the Exhibit C table by proposing all of their approved indirect costs and applicable burdens for these CLINs.   Offerors shall determine the proposed amount to be provided in the Section B Schedule [where the offerors specified their proposed costs] for these CLINs by adding their indirect rates and applicable burdens from Exhibit C to the Government estimated amounts provided in Exhibit C for evaluation purposes.   Note:   Any subcontract labor associated with fixed price or labor hour CLINs shall be included in those CLINs and not the cost reimbursable CLINs.

19.   The Solicitation also included the full text of FAR 52.244-2 (AUG 1988), 48 CFR 52.244-2, which, in pertinent part, provided as follows:

h. No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis….

20.   The Solicitation also included the full text of FAR 52.230-1 (JUN 2000), 48 CFR 52.230-1, which, in pertinent part, provided as follows:

(a)  Any contract in excess of $500,000 resulting from this solicitation will be subject to the requirements of the Cost Accounting Standards Board * * * *

(b)  Any Offeror submitting a proposal * * * must, as a condition of contracting, submit a Disclosure Statement as required by 48 CFR 9903.202.   When required, the Disclosure Statement must be submitted as part of the Offeror's proposal under this solicitation unless the Offeror has already submitted a

6

Disclosure Statement disclosing the practices used in connection with the pricing of this proposal. If an applicable Disclosure Statement has already been submitted, the Offeror may satisfy the requirement for submission by providing the information requested in paragraph (c) * * * *.

(c) Check the appropriate box below:

***

(2) Certificate of Previously Submitted Disclosure Statement.

The Offeror hereby certifies that the required Disclosure Statement was filed as follows:

Date of Disclosure Statement: _____

Name and Address of Cognizant ACO or Federal Official Where                                                  Filed:

_____

The Offeror further certifies that the practices used in estimating costs in pricing this proposal are consistent with the cost accounting practices disclosed in the applicable Disclosure Statement.

21.     The Solicitation also incorporated by reference FAR 52.230-2, Cost Accounting

Standards (APR 1998), 48 CFR 52.230-2, which, in pertinent part, provided as follows:

(a) * * * [T]he Contractor, in connection with this contract, shall—

(1) * * * By submission of a Disclosure Statement, disclose in writing the Contractor's cost accounting practices * * * *
(2) Follow consistently the Contractor's cost accounting practices in accumulating and reporting performance cost data concerning this contract.

* * *

(d) The Contractor shall include in all negotiated subcontracts which the Contractor enters into, the substance of this clause * * * and shall require such inclusion in all other subcontracts of any tier
* * * *

## F.     OFFICIALS OF SAC, SSSI AND DERCO AGREE TO PAY DERCO ON A COST-PLUS-A-PERCENTAGE-OF-COST BASIS

22.     By no later than December 2005, officials of SAC, SSSI and Derco had reviewed

the Solicitation and settled on a proposal strategy to use Derco as a logistics and materials supply

subcontractor in order to inflate the price of materials charged to the contract by paying Derco on a cost-plus-a-percentage-of-cost-basis. This plan was the idea of William Ochsner, who was a high level official within SAC and SSSI as well as the President of Derco, who decided that no other contractor be considered as SSSI's logistics and materials supply subcontractor.

23. Questions about the legality of the plan were raised by a Derco employee, Phil Bail. In response, Ochsner announced in a conference call in the presence of Bail, George Sprinsteen (SSSI's General Manager), Mark Hoehnen (a Derco executive), Barry Nester (an SSSI executive) and Markus Heinrich (a Derco executive) that he knew the proposal would be "non-compliant" with the Solicitation.

24. Ochsner's plan was to promote the use of Derco to the Navy in the proposal as a way to ensure the Navy got the best possible prices on the parts and materials. In reality, Ochsner knew the use of Derco provided little if any benefit to the Navy and his real purpose was to use Derco in order to greatly increase the prices the Navy would pay for the cost reimbursable parts and materials in CLINs X023 and X045 and thereby increase the profits to be made by SAC, SSSI and Derco. This deliberate scheme to defraud would be accomplished by paying Derco on a cost-plus-a-percentage-of-cost basis for material it ordered from vendors. This plan would be hidden from the Navy because, with respect to the cost reimbursable CLINS X023 and X045, the Solicitation, Section B-5.f., only required the offeror to disclose its own indirect rates as applied to the government provided estimate of material costs.

25. Once the contract was awarded to SSSI, the plan as put into effect was for SSSI employees stationed at the Navy facilities in Corpus Christi, Texas, and Pensacola, Florida (where the aircraft were being operated and maintained) to determine what parts were needed and to pass this information electronically to Derco in Milwaukee, Wisconsin. Derco would then place an

Exhibit 1

United States ex rel. Cimma v. Sikorsky Support Services, Inc., et al., No. 14-cv-381

order for the necessary parts to the vendors (in some instances a sole-source provider) at the vendors' catalog or market price. Derco's order would instruct the vendors to ship the part directly to SSSI at the Navy facility where the part was needed, but to send the vendors' invoices to Derco's Milwaukee, Wisconsin headquarters. Derco would then pay the vendors' invoices itself and create a new invoice by taking the vendors' invoice price (i.e. the cost to Derco) and adding a percentage of that cost (agreed to by SAC, SSSI, and Derco) to the vendors' invoice prices to arrive at the amount Derco put on its invoice to SSSI. After Derco submitted its invoice to SSSI, SSSI would submit a public voucher to the United States seeking reimbursement of Derco's charges plus SSSI's then applicable General and Administrative (G&A) rate. SSSI's public voucher would include a copy of Derco's invoice (but not the vendors' original invoices to Derco).

26.     On or about January 5, 2006, officials of SAC and SSSI approved and signed an internal document, called a "Cost Sheet," setting forth the proposed price elements that would comprise the SSSI proposal. The officials of SAC andSSSI who signed the Cost Sheet and the titles they held in the companies at issue were as follows:

| NAME | TITLE(S) HELD | COMPANY |
|---|---|---|
| David Adler | Senior Vice President<br>Vice President | SAC d/b/a WCS<br>SSSI |
| Paul Benedetto | Finance Director | SAC d/b/a WCS |
| Steven Finger | President | SAC |
| Richard J. Pierpont | Vice President & Chief Financial Officer | SAC |
| Sam Mehta | Associate Counsel | SAC d/b/a WCS |

27.     One of these proposed price elements on the Cost Sheet was for "material," which included the T-34 and T-44 aircraft parts and materials subject to the pricing notes in Section B-5.f. of the Solicitation. Although Section B-5.f. of the Solicitation provided these parts were "COST REIMBURSABLE," that the allowable cost for such parts was "the actual catalog/market prices from the vendor" and that "[f]ee/profit is UNALLOWABLE on the actual price of parts,

9

Exhibit 1

United States ex rel. Cimma v. Sikorsky Support Services, Inc., et al., No. 14-cv-381

material and shipping costs," the Cost Sheet nevertheless indicated that the price of such material

would be marked up 22% above its cost.

28.　　Thus, by no later than January 5, 2006, officials at SAC and, SSSI had agreed

Derco would be paid on a cost-plus-a-percentage-of-cost basis that would apply a markup to

material that the Solicitation specified was cost reimbursable at the vendor's catalog or market

price only.

### G.　　SAC OFFICIALS SIGN AND SUBMIT THE SSSI PROPOSAL

29.　　On January 17, 2006, David Adler (one of the signatories to the Cost Sheet), using

SSSI stationary, signed a letter enclosing and submitting SSSI's proposal to the Navy.　Mr. Adler

signed this letter using the title "Senior Vice President."　At that time, Mr. Alder was an employee

of SAC with the title of "Senior Vice President –WCS."　At the time, Mr. Adler's title with SSSI

was "Vice President."

30.　　Mr. Adler's letter stated that each of four principal subcontractors (including

Derco) that SSSI had selected had been chosen "through a careful process modeled after the

Navy's prime contractor selection process," and that related corporate entities (like Derco) were

only chosen if a "better value solution" from an outside contractor was unavailable.　As applied to

Derco, these statements were knowingly false.　Derco was chosen without considering outside

contractors and was selected not because it assured the Navy of better value than other options but

because Derco provided SAC and SSSI with a convenient way to hide the fact that they planned on

charging the Navy far higher prices than it could charge if SSSI itself ordered the parts directly

from the vendors.

31.　　The proposal enclosed with Mr. Adler's letter was set forth on a standard

government form, known as an SF 33, which was executed on behalf of SSSI by Richard J.

10

Pierpont (another of the signatories to the Cost Sheet) using the titles "Vice President –Finance" and "Chief Financial Officer." At the time, Mr. Pierpont was an employee of SAC who held the titles "Vice President-Finance" and "Chief Financial Officer." Mr. Pierpont was not an officer of SSSI on January 17, 2006.

32.     The proposal signed by Mr. Pierpont (and submitted by Mr. Adler on behalf of SSSI) provided as follows:

> The Offeror hereby certifies that the required Disclosure Statement was filed as follows: January 15, 2004 * * * The Offeror further certifies that the practices used in estimating costs in pricing this proposal are consistent with the cost accounting practices disclosed in the applicable Disclosure Statement.

33.     As required by applicable Federal Cost Accounting Standards (CAS), SSSI's January 15, 2004 Disclosure Statement contained provisions explaining SSSI's accounting practices relating to interorganizational transfers and in particular how SSSI would charge Federal contracts where material was transferred to SSSI from related organizations. With regard to interorganizational transfers in, SSSI's January 15, 2004 Disclosure Statement explained that such transfers (and the resulting charge to the government) would be at cost (including the transferor's G&A) unless the item qualified as a commercial item and the transferor had established catalog, market or competitive prices for a given product or service sold in substantial quantities to the general public or where adequate competition existed, in which case the transfer price and the basis for the subsequent charge to the Government would be at that catalog, market or competitive price. SSSI's January 15, 2004 Disclosure Statement did not indicate that interorganizational transfers (and the basis for the resulting charge to the Government) would ever be on a cost-plus-a-percentage-of-cost basis and in fact transfers on such a basis are prohibited by 10

Exhibit 1

United States ex rel. Cimma v. Sikorsky Support Services, Inc., et al., No. 14-cv-381

U.S.C. § 2306(a); 41 U.S.C. § 3905(a) (2011) (formerly 41 U.S.C § 254(b)); and by FAR 52.-244-2(h), 48 CFR. 52.244-2(h).

34.     The proposal executed by Mr. Pierpont and submitted by Mr. Adler also certified, in accordance with FAR 52.230-2, 48 CFR 52.230-2, that:

> (a)     * * * [T]he Contractor, in connection with this contract, shall—
>
> (1) * * * By submission of a Disclosure Statement, disclose in writing the Contractor's cost accounting practices * * * *
> (2)   Follow consistently the Contractor's cost accounting practices in accumulating and reporting performance cost data concerning this contract

35.     At the time these certifications were made, on January 17, 2006, SAC, SSSI and Derco had already determined that SSSI would pay Derco and charge the Government on a cost-plus-a-percentage-of-cost basis in violation of SSSI's January 15, 2004 Disclosure Statement and the proposal's certification of compliance with FAR 52.230-2 in the proposal.   Accordingly, this certification was knowingly false.

## H.     SAC OFFICIALS EXECUTE THE CONTRACT WITH THE NAVY

36.     On June 1, 2006, after notification that the Navy had accepted SSSI's proposal, David Adler, "Senior Vice President –WCS," executed contract no. N00019-06-D-0017 with the Navy on behalf of SSSI.

37.     The contract included the full text of FAR 52.244-2 (AUG 1988), 48 CFR 52.244-2, which, in pertinent part, provided as follows:

> h. No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis….

38.    The contract also incorporated by reference FAR 52.230-2, Cost Accounting

Standards (APR 1998), 48 CFR 52.230-2, which in pertinent part provided as follows:

> (b) * * * [T]he Contractor, in connection with this contract, shall—
>
> > (1) * * * By submission of a Disclosure Statement, disclose in writing the Contractor's cost accounting practices * * * *
> > (2)  Follow consistently the Contractor's cost accounting practices in accumulating and reporting performance cost data concerning this contract.
>
> * * *
>
> (d)  The Contractor shall include in all negotiated subcontracts which the Contractor enters into, the substance of this clause * * * and shall require such inclusion in all other subcontracts of any tier * * * *

39.    The contract also included the following language at Section B-5:

> f.  T-35/T-44 Parts/Material * * *, CLIN's [sic] X023 [and] X045. The CLINs are COST REIMBURSABLE.  * * * The Government will reimburse the Contractor for the allowable actual cost of purchase and replenishment of direct parts and material, vendor repair services, and attendant shipping costs that are necessary for the performance of the work requirements of this contract, up to the funding ceiling * * * *  The Contractor shall acquire materials at the most advantageous prices available with due regard to securing prompt delivery of satisfactory materials * * * *  For parts and material or services procured from a vendor, the actual cost shall be the actual catalog/market price from the vendor.  Fee/profit is UNALLOWABLE on the actual price of parts, material and shipping costs.  The Contractor shall be allowed its actual shipping costs.  * * *[T]he Contractor shall be allowed its normal material burdens in accordance with FAR 52.216-7, "Allowable Cost and Payment," and actual shipping costs.  Offerors shall complete the Exhibit C table by proposing all of their approved indirect costs and applicable burdens for these CLINs.  Offerors shall determine the proposed amount to be provided in the Section B Schedule [where the offerors specified their proposed costs] for these CLINs by adding their indirect rates and applicable burdens from Exhibit C to the Government estimated amounts provided in Exhibit C for evaluation purposes.  Note:  Any subcontract labor associated with fixed price or labor hour CLINs shall be included in those CLINs and not the cost reimbursable CLINs.

13

40. At the time Mr. Adler executed the contract on behalf of SSSI, SAC and SSSI had no intention of following either SSSI's disclosed cost accounting practices as set forth on its January 1, 2004 Disclosure Statement, FAR 52.244-2(h)'s prohibition on cost-plus-a-percentage-of-cost subcontracts, or the pricing terms set forth in Section B-5(f) of the contract.

41. At the time the Navy awarded and executed the contract with SSSI, the United States was unaware of SAC, SSSI and Derco's agreement to pay Derco on a cost-plus-a-percentage-of-cost basis.

## I. DERCO AND SSSI MEMORIALIZE THEIR AGREEMENT AND THEN EXECUTE A SECOND VERSION TO HIDE THE ILLEGAL TERMS

42. Shortly after contract N00019-06-D-0017 went into effect, Derco began submitting invoices containing cost-plus-a-percentage-of-cost charges to SSSI. SSSI officials, including William Ochsner and Robert Schulman, knew Derco's invoices were based on cost-plus-a-percentage-of-cost charges. Instead of a 22% markup on material as had been originally approved in the Cost Sheet, however, Derco marked up its costs by a total of 32%.

43. The increase in Derco's markup from 22% to 32% was approved by William Ochsner, who at the time was President of Derco and a high level officer of SSSI and SAC. It was also known by Robert Schulman of SSSI, George Springsteen, of SSSI, William Aspell of Derco, and Phil Bail of Derco.

44. On August 30, 2006, Derco and SSSI executed a written subcontract agreement memorializing the terms under which Derco had provided and would provide "Contractor Logistics Support for the T-34/T-44/T-6A aircraft" to SSSI under contract N00016-06-D-0017. The subcontract agreement was signed on August 30. 2006 on behalf of SSSI by George Springsteen, its General Manager, and on behalf of Derco by James Aspell, its Vice President –

Program Management. Although signed on August 30. 2006, the subcontract agreement specified its effective date was June 30, 2006.

45. Among other matters, the executed subcontract agreement between SSSI and Derco signed on August 30, 2006 acknowledged that the work to be performed by Derco was being funded by a government contract and that neither the material nor services to be provided by Derco qualified as commercial items or services under applicable regulations.

46. The executed subcontract agreement between SSSI and Derco signed on August 30, 2006 also contained an Attachment 3, titled "Prime Contract Terms and Conditions – Flow Down," which was incorporated by reference into the executed subcontract agreement. Among other things, Attachment 3 included the full-text the language of FAR 52.244-2 (Aug.1988), which provided in pertinent part:

> h. No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis….

47. In direct violation of this term, the executed subcontract agreement signed on August 30, 2006 further provided at Section 6.3:

> Each firm fixed priced invoice shall specify the items billed and include the Derco agreed to markup of thirty-two percent added to the vendor cost.

48. On August 31, 2006, Springsteen and Aspell executed a second version of the subcontract agreement, identical in most respects to the version signed on August 30, 2006, but which deleted any reference to the 32% markup Derco added to its vendor costs to arrive at its invoice prices. Accordingly, the sentence in Section 6.3 was revised in the August 31, 2006 version to read:

> Each firm fixed priced invoice shall specify the items billed.

15

49.     Despite removing the reference to Derco's 32% markup to its vendor costs in the August 31, 2006 version of the executed subcontract agreement, both Derco and SSSI knew when they executed the August 31, 2006 version of the agreement that they had not agreed on any firm fixed prices.   Derco and SSSI also both knew that Derco's invoice prices would be the cost Derco paid its vendors plus 32%.

## J.     DERCO KNOWINGLY SUBMITTED COST- PLUS- A –PERCENTAGE- OF -COST BASED CHARGES ON ITS INVOICES TO SSSI WHICH SSSI KNOWINGLY SUBMITTED FOR PAYMENT ALONG WITH ITS OWN PUBLIC VOUCHERS

50.     With the knowledge and approval of officials of SAC and SSSI, including William Ochsner (an executive with Derco, SSSI and SAC), James Aspell (Derco), Richard Shulman (SSSI), and George Springsteen (SSSI), Derco created the prices on the invoices listed on Ex. A (Doc. No. 44-1) by taking the prices Derco received from its vendors and adding 32% thereto, as was originally described in the first version of the subcontract agreement executed on August 30, 2006.

51.     SSSI, with full knowledge of Derco's cost-plus-a-percentage-of-cost pricing, submitted public vouchers for payment to the United States seeking payment of or reimbursement for Derco's charges.   A list of the public vouchers SSSI submitted for payment to the United States is set forth in Ex. B (Doc. No. 44-2).   Attached to SSSI's public vouchers were copies of Derco's invoices to SSSI.   A list of Derco's invoices to SSSI is identified in Ex. A (Doc. No. 44-1).   SSSI's prices in its public vouchers were the Derco invoice price (which SSSI knew was Derco's costs plus 32% percent of those costs), plus SSSI's then-applicable G&A rate.   SSSI submitted claims for payment to the United States for reimbursement of these charges which SSSI knew were inflated and false.

**K.      SSSI Falsely Explained The Basis For Derco's Charges To The United States**

52.      On or about July 30, 2009, SSSI submitted for payment to the United States public voucher number BVN2573 in the amount of $91,434,18. A spreadsheet attached to this public voucher showed the total charges were split between $88,599.01 in charges for parts plus $2,835.17 representing SSSI's applicable G&A rate.

53.      David Lamb of the Defense Contract Management Agency, who at that time was the Administrative Contracting Officer assigned to contract N00019-06-D-0017, sought clarification of these charges from SSSI.  On August 4, 2009, ACO Lamb emailed Robert Shulman of SSSI asking him to provide an answer to the following question about BVN2573:

> I am using this cost voucher [BVN2573] as an example of parts and material vouchers identified as "DERCO P&M [Parts & Material]" so that I may understand what is being charged.
>
> This $91,434.18 voucher [BVN2573] contained a spreadsheet showing $88,599.01 in parts plus the usual 3.2% G&A, $2,835.17.
>
> I understand that Derco Aerospace Inc. is a sister subsidiary with Sikorsky Aerospace Maintenance of Sikorsky Aircraft Corporation and is the parts supplier for contract N00019-06-D-0017, but not the manufacturer of the parts.
>
> My question is what does the $88,599.01 consist of?   Is it just what Derco paid for the parts or is it what Derco paid for the parts plus some mark-up.
> If so what is the mark-up?

54.      Schulman knew that Derco was charging SSSI the cost Derco paid its vendors for the parts plus 32% of those costs.   Schulman feared, however, that if he provided this information in a truthful answer to ACO Lamb, the United States would not have paid public voucher BVN2573 or any future public voucher submitted by SSSI that included a request to reimburse SSSI for charges based on Derco's cost-plus-thirty-two-percent –of- cost charges.   Schulman also feared that if he answered ACO Lamb's question truthfully, the United States would require SSSI

17

to repay the United States for all of SSSI's public vouchers that the United States had already paid and which included Derco's cost-plus-a-percentage-of-cost charges

55.     On August 5, 2009, to ensure the payment of public voucher BVN2573 and future public vouchers and to avoid having to repay the United States for previously paid public vouchers, SSSI's Shulman responded to the question in ACO Lamb's August 4, 2009 as follows:

> Derco is a Government directed subcontractor that sells material to SAM at FFP.  SAM only puts G&A on the FFP.  How Derco builds up the FFP is a question for the DCAA office assigned to Derco.

56.     The "SAM" referenced in Schulman's email was Sikorsky Aircraft Management, a division of SSSI.   In addition, the abbreviation "FFP" in Schulman's email was an abbreviation for Firm Fixed Price.

57.     The statement in Schulman's August 5, 2009 email that Derco sold parts to SAM at FFP was known to be false by Schulman.   In addition, the suggestion in Schulman's email that he could not answer the question of how Derco built up its prices was also known by Schulman to be false.   Specifically, Schulman knew Derco did not sell to SSSI on a firm fixed price basis and further knew that Derco marked up the cost of parts from its vendor by 32% before sending Derco's invoices to SSSI.

## L.     SSSI Falsely Certified Its Indirect Cost Rate Proposals

58.     On a yearly basis, SSSI submits to the Defense Contract Audit Agency a Certified Indirect Cost Rate Proposal.  Among other things, this Certified Indirect Cost Rate Proposal is used to finalize the provisional indirect rates that SSSI has used in the prior year to bill the government on contracts where SSSI's billing depends, in part, on its indirect rates.  Contract N00019-06-D-0017 is an example of a contract where SSSI's billing to the government depended,

in part, on its indirect rates because SSSI was permitted to add its G&A indirect rate to the costs it paid for the cost reimbursable CLINs X023 and X045 thereunder.

59.     SSSI filed "Certified Indirect Cost Rate Proposals" for each of CY2006 through CY2012 that covered periods during which SSSI was submitting public vouchers under contract N00019-06-D-0017, based in part on its G&A rate

60.     Each of SSSI's annual "Certified Indirect Cost Rate Proposals" contained an express certification that the costs used to calculate the final indirect rate were based only on costs that are allowable and did not include any unallowable costs.   The text of this certification varied only by the subject Calendar Year (CY), the date it was submitted, and the name, title and signature of the individual making the certification on behalf of SSSI.   It provided in pertinent part as follows:

> This is to certify that I have reviewed this proposal to establish final indirect cost rates and to the best of my knowledge and belief:
>
> 1   All costs included in this proposal titled CY20__ SSS – Maintenance Services Division Certified Indirect Cost Rates dated _____ to establish final indirect cost rates for Calendar Year 20__ are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contract to which the final indirect cost rates will apply;
>
> and
>
> 2.   This proposal does not include any costs which are expressly unallowable under applicable cost principles of the FAR of its supplements.

61.     SSSI submitted the following Certificates of Final Indirect Rates containing the above quoted certification language:

> a.   CY2006:  Dated June 28, 2007 and executed by Richard Caswell, Vice President – Finance and Chief Financial Officer;

b. CY2007: Dated June 27, 2008 and executed by Richard Caswell, Vice President – Finance and Chief Financial Officer;

c. CY2008: Dated June 30, 2009 and executed by Richard Caswell, Vice President – Finance and Chief Financial Officer;

d. CY2009: Dated June 30, 2010 and executed by Richard Caswell, Vice President – Finance and Chief Financial Officer;

e. CY2010: Dated June 29, 2011 and executed by Corliss Montesi, CFO, VP Finance, SAS;

f. CY2011: Dated June 27, 2012 and executed by Corliss Montesi, CFO, VP Finance, SAS; and

g. CY2012: Dated June 26, 2013 and executed by Corliss Montesi, CFO, VP Finance, SAS.

## COUNT I
### Against Derco for Violations of 31 U.S.C. § 3729(a)(1) (1986)
### And 31 U.S.C. § 3729(a)(1)(A) (2009)

62. The United States re-alleges and incorporates by reference paragraphs 1-61, above.

63. Derco violated 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009) by knowingly causing SSSI to present false claims for payment to the United States.

64. The false claims for payment which Derco knowingly caused SSSI to submit are the public vouchers listed on Ex. B (Doc. No. 44-2).

65. The actions by Derco which caused SSSI to submit false claims for payment to the United States were as follows:

a. Agreeing to a subcontract with SSSI on a-cost-plus-a-percentage-of-cost basis knowing both that SSSI's prime contract was with the Navy and that the cost-plus-a-percentage-of-cost form of subcontracting was illegal; and

b. Submitting the invoices listed on Ex. A (Doc. No. 44-1) to SSSI, which included Derco's hidden cost-plus-a-percentage-of-cost charges disguised as firm fixed prices, and which Derco expected and intended SSSI to seek payment or reimbursement for from the United States.

20

66.     For each action described in paragraph 65, above, Derco is liable to the United States under the False Claims Act, 31 U.S.C. §3729(a)(1) (1986) or 31 U.S.C. § 3729(a)(1)(A) (2009) for a penalty of between $5,500 and $11,000 and for three times the amount of damages caused thereby.

## COUNT II
### Against Derco for Violations of 31 U.S.C. § 3729(a)(1)(A) (2009)

67.     The United States re-alleges and incorporates by reference paragraphs 1-61, above.

68.     Derco violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting false claims for payment to a contractor of the United States knowing that the contractor was to be reimbursed by the United States.

69.     The false claims for payment Derco presented are those invoices on Ex. A (Doc. No. 44-1) dated on or after May 20, 2009.

70.     For each action described in paragraph 51, above, Derco is liable to the United States under the False Claims Act, 31 U.S.C. §3729(a)(1)(A), for a penalty of between $5,500 and $11,000 and is liable for three times the amount of damages caused thereby.

## COUNT III
### Against SSSI for Violations of 31 U.S.C. § 3729(a)(1) (1986)
### And 31 U.S.C. § 3729(a)(1)(A) (2009)

71.     The United States re-alleges and incorporates by reference paragraphs 1-61, above.

72.     SSSI violated 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009), by knowingly presenting false claims for payment to the United States.

73.     The false claims for payment which SSSI knowingly presented to the United States for payment are those public vouchers listed in Ex. B (Doc No. 44-2).

74.     For each false claim for payment it presented to the United States identified in paragraph 73, above, SSSI is liable to the United States under the False Claims Act, 31 U.S.C. §

3729(a)(1) (1986) or 31 U.S.C. §3729(a)(1)(A) (2009), for a penalty of between $5,500 and $11,000 and is liable for three times the amount of damages caused thereby.

## COUNT IV
### Against SSSI for Violation of 31 U.S.C. § 3729(a)(1)(B) (2009)
### And 31 U.S.C. § 3729(a)(1)(G) (2009)

75.     The United States re-alleges and incorporates by reference paragraphs 1-61, above.

76.     The knowingly false statements in Schulman's August 5, 2009 email were material to and were made to get false claims paid or approved, including public voucher BVN2573 and all public vouchers reflected on Ex. B (Doc. No. 44-2) that SSSI submitted for payment on or after August 5, 2009.

77.     The knowingly false statements in Schulman's August 5, 2009 email were made to conceal and improperly avoid or decrease an obligation to pay or transmit money to the Government, specifically each public voucher listed on Ex. B (Doc. No. 44-2) that the Government paid before August 5, 2014.

78.     SSSI is liable under 31 U.S.C. § 3729(a)(1)(B) (2009) for knowingly making a false record or statement (Schulman's August 5, 2009 email) to get false claims paid or approved and is liable for a penalty of between $5,500 and $11,000 for three times the damages caused thereby.

79.     SSSI is liable under 31 U.S.C. § 3729(a)(1)(G) (2009) for knowingly making a false record or statement (Schulman's August 5, 2009 email) to conceal and improperly avoid or decrease an obligation to pay or transmit money to the Government and is liable for a penalty of between $5,500 and $11,000 and three times the damages caused thereby.

**COUNT V**
**Against SSSI for Violations of 31 U.S.C. § 3729(a)(7) (1986)**
**And 31 U.S.C. § 3729(a)(1)(G) (2009)**

80.     The United States incorporates by reference paragraphs 1-61, above.

81.     Each of the CY2006 to CY2012 Certificates of Final Indirect Costs identified in paragraph 61, above, and submitted by SSSI were knowingly false because each included costs SSSI knew were attributable to SSSI's illegal cost-plus-a-percentage-of-cost subcontract with Derco.  Costs attributable to cost-plus-a-percentage-of-cost subcontracts are not allowable under the FAR and such contracts (and therefore costs associated with them) are expressly unallowable under FAR 52.244-2.

82.     The CY2006 and CY2007 Certificates of Final Indirect Costs constitute false records or statements knowingly made and used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, specifically the unallowable cost-plus-a-percentage-of-cost charges from Derco that SSSI billed to United States in its public vouchers and later included in the CY2006 and CY2007 Certificates of Final Indirect Costs, all in violation of 31 U.S.C. § 3729(a)(7) (1986).

83.     The CY2008 through CY2012 Certificates of Final Indirect Costs constitute false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, specifically the unallowable cost-plus-a-percentage-of-cost charges from Derco that SSSI billed to the United States in its public vouchers and later included in the CY2008 through CY2012 Certificate of Final Indirect Costs, all in violation of 31 U.S.C. §3729(a)(1)(G) (2009).

84.     SSSI is liable under the False Claims Act for a penalty of between $5,500 and $11,000 for each of the CY2006 through CY2012 Certificates of Final Indirect Costs and is also liable for three times the damages caused thereby.

**COUNT VI**
**Against SAC for Violations of 31 U.S.C. § 3729(a)(1) (1986)**

85.     The United States re-alleges and incorporates by reference the allegations in paragraphs 1-61, above.

86.     SAC knowingly caused SSSI to submit false claims for payment to the United States, to wit the public vouchers submitted by SSSI identified in Ex. B (Doc. No. 44-2).

87.     The acts which SAC knowingly engaged in that caused SSSI to submit the false claims were as follows:

> a       Approving the plan to charge a 22% margin on material as reflected on the Cost Sheet signed by its executives;
>
> b.      The approval by its executives, including William Ochsner, of the cost-plus-thirty-two-percent-of-cost mark up between Derco and SSSI.

88.     For each of the acts identified in paragraph 83, above, SAC is liable under the False Claims Act for a penalty of between $5,500 and $11,000 and for three times the damages sustained by the United States because of the act.

**COUNT VII**
**Against SAC for Violations of 31 U.S.C. § 3729(a)(1(B) (2009)**

89.     The United States re-alleges and incorporates by reference paragraphs 1-61, above.

90.     SAC officials knowingly made the following false statements to get false claims paid or approved by the United States:

> a.   SAC falsely stated in the letter enclosing SSSI's proposal that its principal subcontractors (including Derco) were selected using a method similar to the Navy's method of selecting prime contractors

24

and that Derco was selected over outside contractors because it ensured the best value to the Navy.

    b.  SAC falsely stated in the proposal that SSSI would accumulate costs in accordance with its disclosed cost accounting standards.

91.    The above false statements were also made to induce the Navy to award the contract to SSSI and were material to that decision.

92.    For each false statement identified above, SAC is liable under the False Claims Act, 31 U.S.C. § 3729(a)(2) for a penalty of between $5,500 and $11,000 and for three times the damages caused by the acts.

## COUNT VIII
### Unjust Enrichment Against Derco

93.    The United States re-alleges and incorporates by reference the allegations in paragraphs 1-61, above.

94.    The subcontract between Derco and SSSI was an illegal cost-plus-a-percentage-of-cost subcontract and was void *ab initio* under public policy.

95.    Had the United States known that SSSI and Derco had an illegal cost-plus-a-percentage-of-cost subcontract, it would not have provided funds for SSSI to pay Derco for the charges Derco submitted thereunder.

96.    Derco has been unjustly enriched at the United States' expense and the United States is entitled to recover all profits realized by Derco.

## COUNT IX
### Breach of Contract Against SSSI

97.    The United States re-alleges and incorporates by reference the allegations in paragraphs 1-61, above.

98.    SSSI breached its contract no. N00019-06-D-0017 by:

    a.   Failing to follow consistently its disclosed cost accounting practices as set forth on its January 1, 2004 Disclosure Statement;

    b.   Awarding a cost-plus-a-percentage-of-cost subcontract to Derco; and

    c.   Submitting unallowable charges for T-34 and T-44 Aircraft parts and material.

99.    SSSI is liable to the United States for the damages caused by its breaches of contract.

## COUNT X
### Unjust Enrichment Against SSSI

100.    The United States re-alleges and incorporates by reference the allegations in paragraphs 1-61, above.

101.    The subcontract between Derco and SSSI was an illegal cost-plus-a-percentage-of-cost subcontract and was void *ab initio* under public policy.

102.    Had the United States known that SSSI and Derco had an illegal cost-plus-a-percentage-of-cost subcontract, it would not have provided funds for SSSI to pay Derco for the charges Derco submitted thereunder.

103.    SSSI has been unjustly enriched at the United States' expense and the United States is entitled to recover all profits realized by SSSI.

WHEREFORE, the United States demands the following relief:

(a)    On Count I, judgment against Derco for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(b)    On Count II, judgment against Derco for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(c)     On Count III, judgment against SSSI for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(d)     On Count IV, judgment against SSSI for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(e)     On Count V, judgment against SSSI for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(f)     On Count VI, judgment against SAC for three times the damages suffered by the United States plus such civil penalties as are allowable by law

(g)     On Count VII, judgment against SAC for three times the damages suffered by the United States plus such civil penalties as are allowable by law;

(h)     On Count VIII, judgment against Derco for the damages suffered by the United States or, in the alternative, for Derco's profits, plus prejudgment interest;

(i)     On Count IX judgment against SSSI for the damages suffered by the United States plus prejudgment interest;

(j)     On Count X, judgment against SSSI for the damages suffered by the United States or, in the alternative, for SSSI's profits, plus prejudgment interest; and

(k)     Such other relief against the defendants or any of them as this Honorable Court may deem necessary and proper.

JOYCE R. BRANDA
Acting Assistant Attorney General


Dated this 19th day of February, 2015.     /s/ James L. Santelle
JAMES L. SANTELLE
United States Attorney
Eastern District of Wisconsin

Dated this 23rd day of February, 2015.

/s/ Lisa T. Warwick
LISA T. WARWICK
Assistant United States Attorney
Eastern District of Wisconsin
State Bar No. 1017754

MICHAEL A. CARTER
Assistant United States Attorney
Eastern District of Wisconsin
State Bar No. 1090041

517 E. Wisconsin Ave.
Milwaukee, WI 53202
(414) 297-1700
Fax: (414) 297-4394
lisa.warwick@usdoj.gov
Michael.A.Carter@usdoj.gov

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALAN S. GALE
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(202) 307-6296
Fax: (202) 616-3085
alan.gale@usdoj.gov